**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Miami Division)**

CASE NO.:

REBECA MARTINEZ and CHAD SCHUK*,*
*on behalf of themselves and all others*
*similarly situated*,

      Plaintiffs,

vs.

WALMART INC., *a Delaware corporation*,

      Defendant.

_____/

Plaintiffs, REBECA RODRIGUEZ and CHAD SCHUK (collectively, the "Plaintiffs"), individually and on behalf of the Classes defined herein of similarly situated consumers, bring this class action against Defendant, WALMART INC. ("Defendant" or "Walmart"), and allege the following:

### *INTRODUCTION*

1. Beginning in February 2025, President Trump issued a series of executive orders invoking the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), to impose new and significant tariffs ("subject tariffs") on imports from nearly every foreign country, including those from which Walmart sources products.

2. This class action arises from Walmart's retention of windfall money and/or profits generated by the unlawful tariffs imposed by the Trump Administration under the IEEPA. This windfall is a direct result of Walmart systematically passing on a percentage of the costs of IEEPA tariffs to its own customers. Indeed, Walmart has been projected to be entitled to receive as much (if not more) than $10 billion back in tariff refunds.

3.     Following the imposition of the subject tariffs, Walmart publicly stated that it would implement price increases across its product lines to manage the financial impact of the subject tariffs. Walmart's Chief Financial Officer, John David Rainey, stated that "We're wired for everyday low prices, but the magnitude of these increases is more than any retailer can absorb." And during its May 15, 2025 earnings call, Walmart stated that "The higher tariffs will result in higher prices." Consistent with these statements, retail prices for Walmart products increased in the United States as a result of the tariffs. Plaintiffs and the Class purchased Walmart products after these price increases took effect and, as a result, paid higher prices than they would have been otherwise required to pay, reflecting these tariff-related adjustments ("tariff surcharges").

4.     This dispute stems from Walmart's statements and actions surrounding a structural inequity in the tariff refund process. While the importer of record is the only party that may recover a refund from the government for an improperly assessed tariff, the importer is often nothing more than a pass-through vehicle. Frequently, the importer simply fronts the cost of the tariff and recovers a percentage of the cost by imposing higher prices on consumers. The consumer, for all intents and purposes, pays a percentage of the tariff.

5.     On February 20, 2026, the Supreme Court held that the subject tariffs were unlawful. *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *13–14 (U.S. Feb. 20, 2026). And yet, even when the Supreme Court strikes down an unlawful tariff, the truly injured parties possess no direct avenue for redress. American consumers who bore part of the economic burden of these tariffs possess no statutory cause of action in the Court of International Trade ("CIT") — only the importer of record has standing to seek a refund, regardless of who ultimately paid. Large corporations, even if they were to pass on 100 percent of the tariff

burden onto customers, remain fully empowered to recover a complete refund for any unlawful tariffs they paid.

6.      This is no hypothetical. Over 2,000 companies have filed lawsuits in the CIT, actively seeking refunds for every cent of their IEEPA tariff bill, and the CIT has recently announced an administrative procedure to refund the unlawful tariffs without the need to file a lawsuit. Walmart has made no proposal to return to its customers the amount of the tariffs that were previously recovered through price increases. This is so despite estimates from Goldman Sachs that U.S. consumers are "shouldering two-thirds of President Trump's new tariff costs." Though Walmart has not—yet—instituted its own action in the CIT seeking refund of its IEEPA tariff bill, it has also, to date, retained the tariff surcharges for its own benefit and has intentionally refused public comment promising that it would refund those tariff surcharges to its customers. Conversely, companies like FedEx and UPS have already pledged to pass through refunded tariff funds to consumers.

7.      On or about April 20, 2026, U.S. Customs and Border Protection opened the Consolidated Administration and Processing of Entries portal, allowing importers to begin filing refund claims for tariffs the Supreme Court struck down in February.

8.      An April 10, 2026 Citi analysis reported by CNBC projects Walmart is owed approximately $10.2 billion, ahead of Target at $2.2 billion, Nike at roughly $1 billion, Kohl's at $550 million, Home Depot at $540 million, Gap at $400 million, and Macy's at $320 million. Walmart's figure is more than four times Target's and stands out even against a peer set that collectively carries refund exposure well into the billions.[1]

---

[1] https://winningwithwalmart.com/walmarts-10-2-billion-tariff-refund-is-not-a-supplier-windfall/.

9.      Walmart CFO John David Rainey addressed the prospect of recovering refunds at the JPMorgan Retail Round Up on April 8, 2026. He described the refund process as complex and unlikely to happen quickly, stating the company would pursue what it was owed, and noted that any refund received would be recognized in earnings as a P&L benefit. In fact, Mr. Rainey expressly stated that "We'll certainly avail ourselves of the opportunity that we have to get a refund…".[2] On use of proceeds, Citi's equity research note, cited by CNBC, paraphrased most retail management teams as describing options that included share repurchases, debt paydown, and strengthening cash positions. Returning value to the supply base was not among the options surfaced.[3]

10.      This lawsuit seeks to prevent Walmart, the largest retailer in the world by revenue, from the inevitable inequitable recovery it intends to "avail" itself. On May 17, 2025, President Trump warned that "Walmart should stop trying to blame tariffs as the reason for raising prices throughout the chain. Walmart made BILLIONS OF DOLLARS last year, far more than expected. Between Walmart and China they should, as is said, 'EAT THE TARIFFS,' and not charge valued customers ANYTHING. I'll be watching, and so will your customers!" Walmart, to date, has made no commitment to return any portion of anticipated tariff refunds to the consumers who bore those costs. Instead, Walmart acknowledged the opposite. Walmart's Chief Financial Officer, John David Rainey, stated in the Company's fourth-quarter earnings call that inflation for general merchandise—or the prices it charges consumers for products like electronics and appliances—rose more than 3%, up from 1.7% between July and September. Most of those products are imported from overseas and are subject to the tariffs, and "[t]ariff-related costs lifted prices across many categories." Walmart makes no commitment to compensating its customers who paid

---

[2] https://talkbusiness.net/2026/04/retail-imports-slow-walmart-cfo-talks-war-related-uncertainty-tariffs/
[3] *https://winningwithwalmart.com/walmarts-10-2-billion-tariff-refund-is-not-a-supplier-windfall/*.

elevated prices during the Class Period, leaving Walmart the sole benefactor of the illegal tariff windfall. Walmart's simultaneous recoupment of tariff costs from consumers through elevated pricing and from the government through court-ordered tariff refunds constitutes both unjust enrichment at the expense of the Class and violation of Florida law.

11.     Plaintiffs therefore seek a judgment that Walmart is obligated to return to Plaintiffs and proposed Class Members all IEEPA tariffs passed on to customers in the form of higher prices on products, with interest, and that any IEEPA refunds Walmart receives from the U.S. government be held in a constructive trust for the benefit of the Class.

12.     Plaintiffs and the Classes are entitled to restitution of the tariff overcharges they paid, or a proportionate share of any tariff refunds Walmart recovers, together with interest, reasonable attorneys' fees, and costs.

## *PARTIES*

### *Plaintiffs*

13.     Plaintiff, REBECA RODRIGUEZ ("Ms. Rodriguez"), is a resident of this District and a citizen of the State of Florida, residing in Miami-Dade County Florida.

14.     Plaintiff, CHAD SCHUK ("Mr Schuk"), is a resident of this District and a citizen of the State of Florida, residing at in Palm Beach County, Florida.

15.     Ms. Rodriguez is a Walmart customer. Within the Class Period, Ms. Rodriguez made in-store purchases from Walmart of food products, household items, and health and hygiene products imported from countries subject to IEEPA tariffs, at prices inflated by Walmart's pass-through of IEEPA tariff costs.

16.     Mr. Schuk is a Walmart customer. Within the Class Period, Mr. Schuk made in-store purchases from of Walmart electronics, food products, household items, small appliances,

and health and hygiene products imported from countries subject to IEEPA tariffs, at prices inflated by Walmart's pass-through of IEEPA tariff costs.

17.     Both Ms. Rodriguez and Mr. Schuk, and the putative Class, were injured and incurred actual damages at the point of sale due to paying an admittedly inflated cost, specifically because of the pass-through tariffs that Walmart instituted as a policy, practice and pattern, and without adequate disclosure to Plaintiffs and the class.

### *Defendant*

18.     Defendant, WALMART INC. ("Walmart"), is a Delaware corporation, publicly traded under the NYSE ticker symbol "WMT," with its principal place of business at 702 SW 8th Street, Bentonville, Arkansas 72716. Walmart is registered to do business in Florida and operates hundreds of retail facilities throughout the State of Florida, including within this District.

### *JURISDICTION AND VENUE*

19.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Walmart. The Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

20.     This Court has jurisdiction to enter declaratory relief under 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between the parties regarding Walmart's obligation to return to the consumers who paid them the IEEPA tariff surcharges, as well as any IEEPA refunds Walmart recovers from the United States.

21.     This Court has personal jurisdiction over Walmart pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, and consistent with the Due Process Clause of the Fourteenth

Amendment, because Walmart operates and conducts business in Florida; ships goods to and from Florida on a daily basis; maintains numerous operational facilities, distribution centers, and employees in Florida; is registered to do business in Florida; and collected the unlawful IEEPA tariff surcharges from Plaintiffs and proposed Class members within this District.

22.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs reside in this District, Walmart conducts substantial business in this District, and a substantial part of the events giving rise to this action occurred in this District, including Plaintiffs' purchases of tariffed goods at Walmart retail stores located within the Southern District of Florida. Venue is proper in the Miami Division pursuant to Local Rule 3.1 because Ms. Rodriguez resides in Miami-Dade County and a substantial part of the events giving rise to the claims occurred in Miami-Dade County.

## *NATURE OF THE ACTION AND FACTUAL BACKGROUND*

**A.**     *The IEEPA Tariffs and Their Invalidation*

23.     Beginning in February 2025, the President issued a series of executive orders invoking IEEPA to impose new tariffs on goods imported from nearly every foreign country. These included tariffs of 25% on imports from Canada and Mexico (Exec. Orders 14193 & 14194), escalating tariffs on imports from China reaching as high as 145% (Exec. Orders 14195, 14228, 14259, and 14266), and a baseline 10% tariff on nearly all other imports under the "reciprocal tariff" order of April 2, 2025 (Exec. Order 14257), with higher country-specific rates ranging from 11% to 50% on 57 countries. ("Trump Tariffs").

24.     On February 20, 2026, the Supreme Court invalidated all IEEPA-based tariffs in a 6-3 decision. The Court stated: "We hold that IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, 607 U.S. ___ (2026) (slip op. at 20).

25.     U.S. Customs and Border Protection ("CBP") announced on February 22, 2026, that IEEPA duty collection would cease effective February 24, 2026.

26.     Upon information and belief, when the Trump Tariffs were instituted, Walmart privately knew and/or expected that the Trump Tariffs would ultimately be determined to be illegal, but nonetheless instituted the policy, practice and pattern of passing the elevated tariff costs of goods sold to its customers, including Plaintiffs and the Class.

B.     *Walmart's Business Model*

27.     Walmart, the world's largest retailer by revenue, operates a chain of retail stores and a robust e-commerce platform that serves hundreds of millions of customers globally. Walmart sells an enormous quantity and variety of goods, including groceries, appliances, tires, toys, hardware, sporting goods, cameras, books, housewares, apparel, health and beauty aids, furniture, and office equipment.

28.     In fiscal year 2025, Walmart enjoyed net revenues exceeding $680 billion, reflecting its dominant position in the global retail market.

29.     Walmart's core value proposition is defined by the purpose "to save people money so they can live better," centered on providing consumers with "Everyday Low Prices" ("EDLP")—a commitment it uses to attract and retain customers across all market segments. Walmart's pricing model is central to its brand identity, and consumers reasonably rely on Walmart's public pricing representations in their purchasing decisions.

C.     *Walmart's Response to the IEEPA Tariffs*

30.     Walmart is one of the largest importers of consumer goods into the United States, regularly appearing among the top ten U.S. importers by volume. A substantial portion of

Walmart's U.S. merchandise—including electronics, apparel, home goods, and consumables—is sourced from countries subject to IEEPA tariffs, including China, India, and Mexico.

31.      Goods from China alone account for a significant percentage of Walmart's U.S. merchandise sales. Walmart also imports heavily from India and Mexico, both of which were subject to substantial IEEPA tariffs.

32.      Although they may be nominally directed extraterritorially, the increased costs created by the subject tariffs are borne almost entirely by U.S. importers and consumers. Researchers studying recent tariffs estimate that approximately 96% of the tariff cost burden is passed through to American consumers.

33.      While importers must pay the subject tariffs at the border, wholesalers, manufacturers, and retailers all face a choice: whether to absorb the burden of the subject tariffs or pass it on to their customers. In most cases, including in the case of Walmart, part of the burden of tariffs is eventually passed through to U.S. consumers through retail price increases.

34.      Throughout the Class Period, Walmart paid IEEPA tariffs to CBP. Walmart, like most U.S. firms, passed part of the tariff burden onto consumers through elevated retail pricing. Walmart's gross margin data during the tariff period reflects its ability to sustain and expand margins while consumers bore increased costs.

35.      Walmart was able to increase the price of tariffed goods during the peak of the IEEPA tariff regime by selectively raising prices on tariffed goods. The higher prices consumers paid were a consequence of Walmart's increased cost of importation. Absent the imposition of the unlawful IEEPA tariffs, Walmart would not have needed to raise prices on consumers in this way.

36.      In 2025, Walmart's CFO John David Rainey stated that while Walmart was working diligently to "minimize" tariff impacts and would seek to "absorb" some cost increases

where possible rather than pass them to consumers, he admitted that being "wired for everyday low prices" has its limits.

37.    Walmart demonstrably raised prices on numerous tariff-affected product categories throughout the Class Period. Walmart's CFO later acknowledged on an earnings call that "some price increases" were necessary on imported goods affected by tariffs, conceding that certain categories saw meaningful consumer-facing price increases, and that "…tariff related costs lifted prices across many categories."

38.    Walmart's price increases have been corroborated by first-hand accounts from Walmart shoppers across Florida and other states. Upon information and belief, consumers reported seeing price hikes of 20 to 30 percent or more on affected items, including electronics, apparel, and household goods, despite Walmart's public representations about its commitment to low pricing.

39.    Subsequent to the Supreme Court's landmark decision invalidating tariffs imposed under the IEEPA, the U.S. Court of International Trade ordered CBP to remove IEEPA duties from all affected entries. In an order issued March 4, 2026, in *Atmus Filtration, Inc. v. United States* (Ct. No. 26-01259, Order at 1 (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21), the CIT directed CBP to liquidate all unliquidated entries without IEEPA duties and to reliquidate any entries not "finally liquidated" without IEEPA duties. Under the *Atmus* Order, Walmart is entitled to a refund of the IEEPA tariffs ("All importers of record whose entries were subject to IEEPA duties are entitled to the benefit of the *Learning Resources* decision.").

40.    According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits

collected pursuant to IEEPA is approximately $166 billion. *Atmus*, ECF No. 31 at 6. Walmart, as one of the country's largest importers, is entitled to approximately $10.2 billion in refunds.

41.     Walmart is poised to be paid twice for the same unlawful tariff burden: once by its customers (through elevated prices) and once by the U.S. government (through tariff refunds), as it admittedly intends to "avail" itself to the government tariff refund program.

42.     At least one leading economic expert, Stephanie Roth of Wolfe Research, has acutely noted that "Companies are highly unlikely to start trimming their prices as a result. Walmart is not going to give you a check for the 15% tariff on sneakers you bought from them four months ago."

43.     As a direct result of Walmart's tariff pass-through pricing, Class Members paid more for tariffed goods than they would have paid absent the unlawful IEEPA tariffs.

## *CLASS ACTION ALLEGATIONS*

44.     Plaintiffs bring this action on behalf of themselves, individually, and on behalf of all others similarly situated (the "Nationwide Class") as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4).

45.     The Nationwide Class is initially defined as follows:

> **All persons who made in-store purchases from any Walmart Supercenters, Discount Stores, and/or Neighborhood Markets[4] of any consumer good subject to the tariffs imposed under IEEPA, during the period February 1, 2025 through February 24, 2026.**

46.     Additionally, pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), Plaintiffs bring this action on behalf of the following Florida Class initially defined as:

> **All persons in the State of Florida who made in-store purchases from any Supercenters, Discount Stores, and/or Neighborhood Markets of any consumer good subject to the tariffs imposed**

---

[4] https://www.businessinsider.com/photos-store-tour-shopping-review-walmart-discount-store-supercenter-2019-5

**under IEEPA, during the period February 1, 2025 through February 24, 2026.**

47. The Nationwide Class and the Florida Class are referred to herein collectively as the "Class," unless otherwise stated.

48. Excluded from the Class are: (a) Defendant; (b) subsidiaries and affiliates of Defendant; (c) any person or entity who is an officer, director, employee, or controlling person of Defendant; (d) any entity in which Defendant has a controlling interest; (e) the legal representatives, heirs, successors, and assigns of any excluded party; (f) any person who made purchases via any Walmart e-commerce platform, i.e. Walmart.com, Walmart Marketplace, Walmart Realm; and (g) any judicial officer presiding over this action, the members of his or her immediate family and staff, and any juror assigned to this action.

49. The Class Period is February 1, 2025, through February 24, 2026. Plaintiffs reserve the right to amend or modify the class definition(s) with greater specificity, by further division into subclasses, and/or by limitation to particular issues. As described below, the Class satisfies the elements of Fed. R. Civ. P. 23(a) and Rule 23(b).

50. *Numerosity.* The Members of the Class are so numerous that joinder of all Members is impracticable. As of January 31, 2026, Walmart operates approximately 5,212 total U.S. retail units nationally, and approximately 387 retail units in Florida, making Florida the third most-stocked state in the country, behind Texas and California. That count covers Walmart-branded locations (Supercenters, Discount Stores, and Neighborhood Markets). Walmart sells millions of products each month in Florida, and upon information and belief, there are several million people in the proposed Class.

51. *Typicality.* Plaintiffs' claims are typical of the claims of the Members of the Class. Throughout the Class Period, Plaintiffs purchased from Walmart electronics, food products,

household items, small appliances, and health and hygiene products imported from countries subject to IEEPA tariffs, at prices inflated by Walmart's pass-through of IEEPA tariff costs. Plaintiffs' claims are also typical of the other Class Members in that Plaintiffs have been damaged as a result of paying an unfairly elevated prices to Walmart.

52.      *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the putative Class and have retained counsel competent and experienced in class action litigation. Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

53.      *Superiority.* A class action is superior to any other available means for the fair and efficient adjudication of the Classes' claims. The damages suffered by certain individual Members of the Class are relatively small compared to the burden of individual prosecution of the complex litigation required to recover from Walmart. It would be impractical for most, if not all, Class Members to seek relief on an individual basis. Furthermore, individual litigation could result in thousands of individual lawsuits, introducing the risk of inconsistent judgments and increasing the delay and expense to all parties. In contrast, a class action would present far fewer administrative difficulties. The Members of the Class are ascertainable through methods typical of class action practice and procedure, including through Walmart's own transactional records.

54.      *Predominance of Common Questions of Law and Fact.* Numerous questions of law and fact are common to Plaintiffs and all Members of the Class. These common questions will result in common answers for all Class Members that will impact the resolution of the claims on grounds equally applicable to all Class Members. These common questions, which predominate over any questions affecting only individual Class Members, include, but are not limited to:

a.  Whether a portion of the higher prices that consumers paid for Walmart's products are attributable to the cost of IEEPA tariffs;

b.  Whether Walmart privately knew and/or had reason to believe that the Trump Tariffs would ultimately be determined to be illegal, but nonetheless instituted the policy, practice and pattern of passing the elevated tariff costs of goods sold to its customers, including Plaintiffs and the Class.

c.  Whether Walmart must disgorge the refunds to its customers, once it "avails" itself to the government tariff refund process;

d.  Whether Walmart is obligated to return IEEPA tariffs to the consumers who paid them in the form of higher prices;

e.  Whether Walmart's retention of elevated consumer payments constitutes unjust enrichment under Florida law;

f.  Whether Walmart acted unfairly, deceptively, or unconscionably by up-charging consumers in response to tariff-related costs while failing to reimburse consumers upon learning the tariffs were illegal;

g.  Whether Walmart's conduct constitutes an unfair or deceptive trade practice under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.;

h.  Whether Walmart's failure to disclose its anticipated CIT refund to customers at the point of sale or otherwise constitutes a material omission or misrepresentation under FDUTPA;

i.  Whether the imposition of a constructive trust over IEEPA tariff refunds received by Walmart from the U.S. government is warranted;

j.  Whether Walmart's conduct has harmed Plaintiffs and the Class uniformly;

k.  The measure of damages available to Plaintiffs and the Class due to increased prices caused by Walmart's tariff pass-through; and

l.  Whether restitution is the appropriate measure of relief, and if so, the appropriate amount.

55.  ***Rule 23(b)(2) Class Certification.*** Walmart has acted in a manner that applies generally to the proposed Class, making both declaratory and injunctive relief appropriate with respect to the proposed Class as a whole. Walmart's decision to raise prices on goods subject to IEEPA duties and then seek a blanket refund from the government without committing to establish any customer refund mechanism warrants class-wide declaratory and injunctive relief and the imposition of a constructive trust.

56.  In addition to, or in the alternative to, certification of the Class under Rule 23(b)(2) and/or Rule 23(b)(3), Plaintiffs respectfully request that the Court certify the issues listed in Paragraph 54 herein for class wide adjudication pursuant to Federal Rule of Civil Procedure 23(c)(4). Each of these issues arises from Walmart's own uniform conduct, is susceptible to common proof, and can be resolved on a class wide basis without resort to individualized inquiry. Resolution of these issues in a single proceeding will materially advance the disposition of this litigation, promote judicial economy, and avoid the risk of inconsistent adjudications. Certification of these issues under Rule 23(c)(4) will materially advance this litigation by resolving the central, contested questions of liability on a class wide basis. To the extent any individualized issues remain following such resolution — including, if applicable, individualized damages, specific causation, or reliance — such issues may be addressed through appropriate subclasses and/or claims administration following class wide adjudication of the certified issues. Proceeding in this manner

is superior to thousands of individual actions, each of which would require duplicative litigation of the same core questions concerning Defendant's conduct. For these reasons, certification of the foregoing issues under Rule 23(c)(4) is appropriate.

**COUNT I**
***Violation of the Florida Deceptive and Unfair Trade Practices Act***
***(Fla. Stat. § 501.201 et seq.)***
*(On Behalf of Plaintiffs and the Florida Class Only)*

Plaintiffs hereby reallege and incorporate the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein and further allege as follows:

57.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*, was enacted to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA is a remedial statute that is to be "liberally construed" to promote consumer protection. Fla. Stat. § 501.202.

58.     FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

59.     An "unfair practice" is defined as one that offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Bechor v. Simcenter, Inc.*, 394 So. 3d 666 (2024). A "deceptive act" involves a representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Moses*, 913 F.3d 297 (2019); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (1988).

60.     Neither intent nor knowledge on Walmart's part is required to prove a violation, as the statute focuses on the impact of the conduct on consumers rather than the actor's state of mind. *Bechor, supra, Moses, supra, World Travel Vacation Brokers, Inc., supra,*

61. Further, "[U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *State, Office of Att'y Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004). An "unfair practice" has been defined as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003); *Bechor, supra*.

62. Plaintiffs and each Class Member are "consumers" within the meaning of Fla. Stat. § 501.203(7), having purchased goods from Walmart for personal, family, or household purposes.

63. Walmart is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) by the advertising, soliciting, providing, offering, and distribution of consumer goods to Florida residents.

64. A FDUTPA consumer claim has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016). A deceptive practice is one that is "likely to mislead" consumers acting reasonably under the circumstances, and an unfair practice is one that "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

65. Walmart engaged in unfair and deceptive trade practices in violation of FDUTPA by, among other acts: (a) imposing tariff surcharges on Florida consumers as components of inflated retail prices without disclosing the existence, magnitude, or composition of those surcharges; (b) representing to consumers, through its longstanding "Everyday Low Prices" brand identity, that its prices reflect genuine cost efficiency rather than embedded pass-through of unlawful government exactions; (c) failing to disclose to consumers, at the point of sale or

otherwise, that Walmart anticipated obtaining a refund of the unlawful IEEPA tariffs from the U.S. government while simultaneously charging consumers prices inflated by those tariffs; (d) continuing to retain the tariff surcharges after the Supreme Court invalidated the IEEPA tariffs in *Learning Resources*, thereby effecting a double recovery at the expense of Florida consumers; and (e) refusing to commit to or implement any mechanism to refund the tariff surcharges to Florida consumers despite the legal nullity of the underlying tariffs.

66.     Walmart's conduct also constitutes an unconscionable act or practice under FDUTPA. The simultaneous recoupment of an identical economic burden twice over—once from consumers and once from the government—offends established public policy and is substantially injurious to Florida consumers who have no avenue to seek a refund from the government directly.

67.     Walmart's conduct was likely to mislead, and did in fact mislead, reasonable consumers, including Plaintiffs and the Florida Class. Reasonable consumers paying Walmart's elevated prices were not informed that a portion of those prices represented an advance of unlawful tariffs that Walmart was positioned to recover from the government and retain entirely for itself.

68.     Walmart's unfair and deceptive practices were willful, as Walmart possessed actual knowledge that it was raising consumer prices in response to tariff costs while simultaneously positioning itself to obtain government refunds for those same costs, and Walmart affirmatively chose not to disclose this dual-recovery strategy to its customers.

69.     Plaintiffs and the Florida Class Members were aggrieved and suffered actual damages as a direct and proximate result of Walmart's unfair and deceptive practices, in an amount equal to the tariff-cost component embedded in the prices they paid for tariffed goods during the Class Period.

70.    Pursuant to Fla. Stat. §§ 501.211 and 501.2105, Plaintiffs and the Florida Class are entitled to:

   a.   Declaratory relief that Walmart's acts and practices described herein violate FDUTPA, pursuant to Fla. Stat. § 501.211(1);

   b.   Injunctive relief enjoining Walmart from continuing to engage in the unlawful acts and practices described herein, including an order requiring Walmart to disgorge and refund the tariff-cost component of prices charged to Florida Class Members, pursuant to Fla. Stat. § 501.211(1);

   c.   Actual damages in an amount to be proven at trial, pursuant to Fla. Stat. § 501.211(2);

   d.   Reasonable attorneys' fees and court costs pursuant to Fla. Stat. § 501.2105; and

   e.   Such other and further relief as the Court deems just and proper.

## COUNT II
### *Unjust Enrichment*
*(Florida Common Law — On Behalf of Plaintiffs and the Class)*

Plaintiffs hereby reallege and incorporate the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein and further allege as follows:

71.    Under Florida law, the elements of a claim for unjust enrichment are: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Della Ratta v. Della Ratta*, 927 So. 2d 1055, 1059 (Fla. 4th DCA 2006); *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012).

72.     Plaintiffs and each Member of the proposed Class conferred a direct and measurable benefit upon Walmart by paying inflated retail prices on goods subject to the IEEPA tariffs. These inflated prices were caused by Walmart's decision to pass on a portion of the IEEPA tariff costs to its customers in the form of tariff surcharges.

73.     Walmart knew of and voluntarily accepted the benefits conferred by Plaintiffs and the Class. Walmart's own public statements and earnings disclosures, including those of its Chief Financial Officer, demonstrate Walmart's actual knowledge that it was collecting tariff-related surcharges from its customers.

74.     Walmart has retained these benefits. Walmart has neither offered to return nor, upon information and belief, segregated the tariff-surcharge component of consumer payments, and has signaled its intention to retain in addition the full amount of any IEEPA tariff refunds it receives from the U.S. government under the *Atmus* Order and related refund procedures.

75.     The Supreme Court has determined in *Learning Resources* that the IEEPA tariffs lacked statutory authority and were unlawful. Under the circumstances, it would be inequitable for Walmart to retain both (a) the tariff surcharges collected from Plaintiffs and the Class through inflated retail prices and (b) any government refund corresponding to those same unlawful tariffs. Walmart's simultaneous double recovery—from consumers and from the government for the identical economic burden—offends the principles of equity and good conscience that underlie Florida's law of unjust enrichment.

76.     Walmart's retention of these benefits, without compensation to Plaintiffs and the Class, would be unjust. Equity requires that Walmart pay over to Plaintiffs and the Class any IEEPA tariff costs passed through to customers, together with any IEEPA tariff refunds Walmart has received or will receive from the U.S. government attributable to such tariffs.

77.     Plaintiffs and the Class are entitled to restitution, disgorgement, the imposition of a constructive trust over any IEEPA tariff refunds received by Walmart, and such other equitable relief as the Court deems appropriate.

## COUNT III
### *Money Had and Received*
*(Florida Common Law — On Behalf of Plaintiffs and the Class)*

Plaintiffs hereby reallege and incorporate the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein and further allege as follows:

78.     Under Florida law, an action for money had and received is a common-law action in assumpsit, founded on principles of equity, that "lies where the defendant has received money which in equity and good conscience belongs to the plaintiff." *Hall v. Humana Hosp. Daytona Beach*, 686 So. 2d 653, 656 (Fla. 5th DCA 1996); *see also Moore Handley, Inc. v. Major Realty Corp.*, 340 So. 2d 1238, 1239 (Fla. 4th DCA 1976). The action is equitable in nature and is available to recover money that, in equity and good conscience, belongs to another.

79.     Walmart received money from Plaintiffs and from each Member of the proposed Class in the form of higher prices proximately caused by the pass-through of IEEPA tariff costs.

80.     Walmart received this money for the purpose of repaying itself part of the IEEPA tariffs it had advanced, as the importer of record, to CBP as duties on imported goods.

81.     The Supreme Court has since determined in *Learning Resources* that those tariffs lacked statutory authorization and were unlawful, and the Court of International Trade has ordered CBP to refund the unlawful tariffs to importers, including Walmart.

82.     The money that consumers paid above and beyond what they would have paid absent the IEEPA tariffs, in equity and good conscience, belongs to Plaintiffs and to each Member of the proposed Class. Likewise, any IEEPA tariff refunds Walmart receives from the United

States, to the extent they correspond to the amounts Walmart already recouped from its customers through inflated prices, in equity and good conscience belong to Plaintiffs and the Class.

83.     Walmart has not returned the money and has not committed to doing so.

84.     In equity and good conscience, Walmart should not be permitted to retain these funds. The money belongs to Plaintiffs and the Class, and Walmart is obligated to return it. This Count is pleaded in the alternative to Count II. While Count II (Unjust Enrichment) addresses the inequity of Walmart's retention of consumer overcharges already collected, this Count more particularly addresses Walmart's receipt and/or anticipated retention of government refund proceeds that, in equity, represent a return of money that was economically borne by Members of the Classes, not by Walmart.

85.     Plaintiffs and the Class are entitled to recover from Walmart all such money, together with prejudgment interest, and to the imposition of a constructive trust on any IEEPA refund proceeds pending such restitution.

**COUNT IV**
***Declaratory Judgment***
***(28 U.S.C. §§ 2201 and 2202)***
*(On Behalf of Plaintiffs and the Class)*

Plaintiffs hereby reallege and incorporate the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein and further allege as follows:

86.     An actual, justiciable controversy of sufficient immediacy and reality exists between Plaintiffs and the Class, on the one hand, and Walmart, on the other, concerning their respective rights and legal relations under Florida law, federal common law, and equity with respect to: (a) Walmart's collection and retention of tariff surcharges from Florida and nationwide consumers during the Class Period; (b) Walmart's entitlement, vel non, to retain IEEPA tariff refunds received from the U.S. government corresponding to tariff costs already recouped from

consumers; (c) Walmart's obligations under FDUTPA and Florida common law to refund the tariff-cost component of inflated prices; and (d) the propriety of equitable relief, including the imposition of a constructive trust on any IEEPA refund proceeds.

87.     Plaintiffs and the Class request, pursuant to 28 U.S.C. §§ 2201 and 2202, a declaratory judgment that:

    a.  Walmart's collection and retention of the tariff-cost component of inflated retail prices, in light of the invalidation of the IEEPA tariffs, constitutes unjust enrichment under Florida law and violates FDUTPA;

    b.  Walmart is obligated to return to Plaintiffs and the Class all IEEPA tariff costs passed on to consumers in the form of higher prices, with interest;

    c.  Any IEEPA tariff refunds Walmart has received or will receive from the U.S. government, to the extent they correspond to amounts Walmart already recouped from its customers through inflated prices, in equity and good conscience belong to Plaintiffs and the Class;

    d.  Walmart holds, or upon receipt will hold, such IEEPA tariff refund proceeds as constructive trustee for the benefit of Plaintiffs and the Class; and

    e.  Such further declaratory relief as the Court deems just and proper.

88.     Plaintiffs further request all further necessary or proper relief based on the declaratory judgment pursuant to 28 U.S.C. § 2202.

### COUNT V
***Injunctive Relief Under Federal Rule of Civil Procedure 23(b)(2)***
*(On Behalf of Plaintiffs and the Class)*

Plaintiffs hereby reallege and incorporate the allegations contained in Paragraphs 1 through 56 above as though fully set forth herein and further allege as follows:

89.     Federal Rule of Civil Procedure 23(b)(2) permits class certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

90.     Walmart has acted and continues to act on grounds generally applicable to the Class. Specifically, Walmart has: (a) uniformly passed through a portion of the IEEPA tariff costs to all customers purchasing tariffed goods; (b) uniformly failed to establish any customer refund mechanism for the tariff costs it passed on; and (c) failed to commit to returning to its customers any tariff refunds it is entitled to receive, retaining those refunds for Walmart's sole benefit.

91.     Absent injunctive relief, Walmart will retain all ill-gotten increased profits from unlawful tariffs and any government tariff refunds—which may exceed ten billion dollars—without compensating the consumers who actually bore a substantial portion of the economic burden of those tariffs. This harm is imminent, as the Court of International Trade has already issued a refund order and refund payments are anticipated imminently. *See Atmus*, *supra*.

92.     Plaintiffs and the Class will suffer irreparable harm absent injunctive relief. Monetary damages alone may be inadequate to remedy the harm because: (a) the refund proceeds may be commingled with general corporate assets, making tracing difficult or impossible; (b) future price reductions vaguely promised by Walmart do not constitute adequate legal relief for past economic injuries; and (c) the diffuse nature of the harm across millions of consumers creates practical barriers to full monetary recovery. The balance of equities tips decidedly in favor of Plaintiffs and the Class, and the public interest strongly favors preventing Walmart's double recovery at the expense of Florida and American consumers.

93.     Plaintiffs therefore request that the Court, pursuant to Federal Rule of Civil Procedure 23(b)(2) and Fla. Stat. § 501.211(1), enter injunctive relief:

a.  Enjoining Walmart from retaining, disbursing, or otherwise dissipating any IEEPA tariff refunds received from the U.S. government, pending resolution of this litigation;

b.  Requiring Walmart to establish and maintain an identifiable, segregated account—*i.e.*, a constructive trust—to hold all IEEPA tariff refunds received from the U.S. government pending further order of this Court;

c.  Requiring Walmart to disclose to this Court and to Class Members the total amount of IEEPA tariff refunds it has received or anticipates receiving from the U.S. government;

d.  Requiring Walmart to establish a fair and equitable refund mechanism through which affected Class Members may recover the tariff-cost component of the inflated prices they paid during the Class Period; and

e.  Enjoining Walmart from continuing to engage in the deceptive, unfair, and unconscionable acts and practices described herein with respect to Florida consumers.

94.     The proposed injunctive relief is appropriate respecting the Class as a whole because Walmart's conduct and the requested relief apply uniformly and without differentiation to all Class Members.

## ***PRAYER FOR RELIEF***

WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class and the Florida Class, respectfully request that this Court enter judgment in their favor and against Walmart and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), (b)(3), and/or (c)(4); appoint Plaintiffs as Class Representatives and appoint the undersigned counsel as Class Counsel; and direct that notice of this action be given to Members of the Class;

B. Enter a declaration that Walmart's actions violate the Florida Deceptive and Unfair Trade Practices Act and equitable principles of Florida common law, and that Walmart is obligated to return to Plaintiffs and the proposed Class Members all IEEPA duties passed on to customers in the form of higher prices on products, with interest;

C. Award Plaintiffs and the Class actual damages in an amount to be determined at trial, including without limitation under Fla. Stat. § 501.211(2);

D. Award Plaintiffs and the Class restitution and disgorgement of all amounts by which Walmart was unjustly enriched at the expense of the Class, including the tariff-cost component of prices charged to Class Members and any IEEPA tariff refunds received by Walmart from the U.S. government corresponding to such amounts;

E. Impose a constructive trust upon all IEEPA tariff refunds received or to be received by Walmart from the U.S. government attributable to tariff costs that Walmart passed on to Plaintiffs and the Class, for the benefit of Plaintiffs and the Class;

F.  Enter injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2) and Fla. Stat. § 501.211(1), as described in Count V, including (i) enjoining Walmart from retaining, disbursing, or otherwise dissipating any IEEPA tariff refunds received from the U.S. government pending resolution of this litigation; (ii) requiring Walmart to establish a segregated account or constructive trust to hold such refunds; (iii) requiring Walmart to disclose the amount of refunds received or anticipated; (iv) requiring Walmart to establish a consumer refund mechanism; and (v) enjoining Walmart from continuing to engage in the deceptive, unfair, and unconscionable acts and practices described herein;

G.  Enter an order establishing a Qualified Settlement Fund pursuant to Section 468B of the Internal Revenue Code, 26 U.S.C. § 468B, and Treasury Regulation § 1.468B-1, to be subject to the continuing jurisdiction of this Court, for the purpose of receiving, holding, administering, and distributing any settlement proceeds, judgment amounts, attorneys' fees, costs, or other recoveries obtained on behalf of Plaintiffs and the putative Class/class members in this action; and for the appointment of a qualified fund administrator and trustee to manage the Fund in accordance with applicable law and further orders of this Court.

H.  Award Plaintiffs and the Class an accounting of all IEEPA tariff surcharges collected from consumers and all IEEPA tariff refunds received or anticipated to be received from the U.S. government;

I.  Award Plaintiffs and the Class reasonable attorneys' fees and costs pursuant to Fla. Stat. § 501.2105, the common fund doctrine, and any other applicable authority;

J.   Award prejudgment and post-judgment interest at the maximum rates permitted by law;

K.   Award Plaintiffs and the putative Class Members damages in an amount in excess of $75,000.00 and, in the aggregate, in excess of $5,000,000.00; and

L.   Grant such other and further legal and equitable relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 22, 2026

Respectfully submitted,

By: */s/ James P. Gitkin*
James P. Gitkin, Esq.
Fla. Bar No.: 570001
**SALPETER GITKIN, LLP**
3864 Sheridan Street
Hollywood, FL 33021
Telephone: (954) 467-8622
Facsimile: (954) 467-8623
*jim@salpetergitkin.com*

By: */s/ Thomas J. Connick*
Thomas J. Connick, Esq.
Ohio Bar No.: 0070527
*Pro hac vice (pending)*
**SCHNEIDER BELL LLP**
1375 E. Ninth Street, Suite 900
Cleveland, OH  44114
Telephone: (216) 696-4200
Facsimile: (216) 696-7303
*tconnick@mysblaw.com*

By: */s/ Edward W. Cochran*
Edward W. Cochran, Esq.

Ohio Bar No.: 0032942
*Pro hac vice (pending)*
20030 Marchmont Rd.
Shaker Heights, OH  44122
Telephone: (216) 577-4545
*edward@edwcochran.com*

By:*/s/ John C. Rayson*
    John C. Rayson, Esq.
    Fla. Bar No.: 204153
    1031 NE 27th Avenue
    Pompano Beach, FL 33062
    Telephone: (954) 258-3585
    *johncrayson@gmail.com*

    *Attorneys for Plaintiff and the Putative Class Members*